**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TERRY HOLDEN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-2008 |
| | § | |
| BLUE CROSS AND BLUE SHIELD | § | |
| OF TEXAS, INC. EMPLOYEE | § | |
| LONG TERM DISABILITY PLAN, | § | |
| RELIANCE STANDARD LIFE INS. CO., | § | |
| FORT DEARBORN LIFE INS. CO, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This is an ERISA case arising from the denial of long-term disability benefits under

a plan Blue Cross and Blue Shield of Texas, Inc. provided to its employees.  Terry Holden,

a former employee, sued the Blue Cross and Blue Shield of Texas, Inc. Employee Long Term

Disability Plan (the "Plan"), after the long-term disability benefits she had received for over

four years were terminated.  Holden sued the Plan; Fort Dearborn Life Insurance Company,

the insurer and plan administrator; and Reliance Standard Life Insurance Company, which

acquired Integrated Disability Resources ("IDR"), the company that had served as Fort

Dearborn's "claims advisory agent."[1]  Holden sued under 29 U.S.C. sections 1132(a)(1)(B) and 1133.

Fort Dearborn has moved for summary judgment that, as a matter of law, the decision to discontinue the long-term disability benefits did not violate ERISA.  (Docket Entry No. 18).  Holden cross-moved for summary judgment that a *de novo*, rather than abuse of discretion, standard of review applied; that the decision to discontinue benefits was not based on "concrete record evidence"; and that the defendants had failed to provide a "full and fair review of the claim" because the final decision was based on a different ground than the initial denials and on materials not part of the administrative record.  Both parties have filed responses, replies, and supplemental briefing in support of their motions.  (Docket Entry Nos. 27, 29, 30, 31, 32).

Based on the pleadings; the motions, responses, replies, and supplemental briefing; the administrative record; and the applicable law, this court grants Fort Dearborn's motion for summary judgment and denies Holden's cross-motion for summary judgment.  Final judgment is entered by separate order.  The reasons for these rulings are set out below.

## I.  Background

---

[1]  Reliance Standard filed an unopposed motion to dismiss on the ground that it was not a fiduciary under ERISA and that nonfiduciary plan administrators cannot be held liable under ERISA.  Reliance Standard stated that its "only involvement in this case was its handling of Plaintiff's appeal after it bought the assets of Fort Dearborn's previous claims advisory agent," that it "did not exercise any discretion in handling Plaintiff's appeal," and that "Fort Dearborn, as the insurer, retained final decision-making authority over all discretionary questions." (Docket Entry No. 10 at 2–3).  Reliance Standard's unopposed motion to dismiss was granted on September 28, 2007.  (Docket Entry No. 11).

### A.    The Plan Terms

The administrative record includes the Summary Plan Description for the Long-Term Disability Insurance for Blue Cross and Blue Shield employees.   The Summary Plan Description defines "disability" for the first 24 months as an inability because of "Injury or Sickness" to "perform each of the material duties of your regular occupation."   After 24 months of disability payments, the standard changes to an inability to "perform each of the material duties of any gainful occupation for which you are reasonably fitted taking into consideration training, education or experience." (Admin. Rec. at 5).  The Plan also contains a "Mental Health Limitation."  Payments for a disability "due to or resulting from psychiatric or psychological conditions, regardless of cause, such as . . . Depression; Manic depressive or bipolar illness; Anxiety; Personality disorders; and/or Adjustment disorders or other conditions" stop after 24 months unless certain situations (none of which apply in the present case) are met.  (*Id.* at 10).

The Summary Plan Description does not include so-called *Bruch* language, expressly providing discretionary authority to the Plan Administrator, Fort Dearborn, to interpret the Plan provisions and to determine benefit eligibility.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Nor does the Summary Plan Description provide that Fort Dearborn may delegate its fiduciary responsibilities either to another named fiduciary or to a third party.  *See* 29 U.S.C. § 1105(c)(1).  The Summary Plan Description does state that Fort Dearborn will determine  "the extent of any Sickness or Injury for which you have made a claim," and has the "right and opportunity to have [the Plan beneficiary] examined by a

Physician or vocational expert of its choice. . .  as often as reasonably required," and "at its expense."  (*Id*. at 12).

The administrative record includes a copy of the Group Long Term Disability Insurance Policy (the "Policy") that the Summary Plan Description describes.  As in the Summary Plan Description, *Bruch* language is absent from the Policy and there is no authorization for Fort Dearborn to delegate its fiduciary responsibilities.  As in the Summary Plan Description, the Policy provides that Fort Dearborn, "at its own expense, will have the right and opportunity to have an Employee, whose Injury or Sickness is the basis of a claim, examined by a Physician or vocational expert of its choice."  (*Id*. at 80).

On November 19, 2001, Fort Dearborn sent Holden a letter informing her that it had retained Claims Service International ("CSI") as an advisory agent.  The letter stated that CSI would "assist" Fort Dearborn in evaluating claimants' disabilities.  CSI would obtain and review all medical information for disability claims "on a direct basis."  A CSI agent would be "the person who is reviewing [claimants'] medical information."  (*Id*. at 459).  The letter stated that "Fort Dearborn will remain an integral part of the overall claim handling.  We will continue to issue checks from our office."  (*Id*.).

In 2003, Integrated Disability Resources ("IDR") replaced CSI as Fort Dearborn's claims advisory agent. On February 20, 2003, Holden received a letter from IDR stating, "[w]e are the claims advisory agent for Fort Dearborn Life Insurance Company."  The letter stated that IDR was reviewing Holden's disability status to determine her eligibility for continued benefits beyond April 7, 2003, twenty-four months after she began receiving

benefits. (*Id.* at 495). The administrative record does not contain a copy of contracts or the terms of the arrangements between Fort Dearborn and CSI or IDR.

### B.   Holden's Disability Claim, Benefit Payments, and Benefit Termination

The record discloses the following chronology relevant to Holden's claim:

- **1997**: Holden began working for Blue Cross and Blue Shield of Texas. Holden was employed as a Customer Service Representative. Her job was essentially sedentary. Holden sat at a desk for approximately six hours each day, answering phone calls and operating a computer. (*Id.* at 336).

- **September 2000**: Holden stopped working based on neck, shoulder, back, and leg pain. A September 2000 letter from Dr. Woodrow W. Janese, a neurosurgeon who evaluated Holden, stated that she had been treated for depression with Xanax and Imipramine for 7 years. The letter stated that Holden's MRI showed "small L4-5 HNP" and "L5-S1 facet degeneration." (*Id.* at 287-88).

- **March 2001**: Holden had back surgery. Dr. Michael Graham, an orthopedic surgeon, performed a cervical fusion at C6-7. (*Id.* at 366-67, 557-59).

- **May 24, 2001**: Fort Dearborn sent Holden a letter informing her that her disability benefits application was approved. She began receiving benefits on April 7, 2001. (*Id.* at 419).

- **October 2001**: Dr. Graham performed an anterior/posterior fusion of L4-L5. (*Id.* at 468-473, 557-59).

- **April 2002**: Dr. Graham's notes from a postoperative consultation state that Holden reported feeling better than before the second operation and that post-operative radiographs showed satisfactory alignment.   Dr. Graham instructed Holden to "completely taper off the controlled substances."  (*Id*. at 576).

- **February 2003**: In a status call with an IDR claims representative, Holden reported severe pain, continued reliance on pain medications, particularly Oxycontin, and an inability to do more than one chore a day in the house.  She stated that she could dress and shower herself, could do laundry if someone took the clothes out of the machine and carried them upstairs after she folded them, could make a bed by kneeling, and could cook if someone took heavy dishes out of the oven for her.  Holden discussed the possibility of removing hardware from her back to ease the pain.  (*Id*. at 493-94).

- **June 30, 2003**:  Dr. Graham performed another surgery to remove the L4-L5 "bilateral spinal instrumentation," to alleviate continued pain.  Dr. Graham explored the lumbar fusion and found it to be "well-established."  (*Id.* at 682).

- **November 18, 2003**:  In an office visit, Dr. Graham noted that although Holden reported feeling better than before the operation to remove the hardware, she was still taking pain and muscle-relaxer medications.  "She admits today that she has been taking the medication for an extended period of time, and that she was taking the medication for a long time prior to her initial surgical procedure.  She has been unable to taper off of the medications without going into withdrawal."  Dr. Graham "strongly advised" Holden to ask that her pain-management doctor provide a structured drug

6

rehabilitation program.  The record does not show that Holden made this request.
(*Id.* at 686).

- **December 2003**:  In a disability interview with Janet A. Thurston, a nurse clinical-
  care manager for IDR, Holden stated that the surgery had helped the pain in the back,
  but she continued to have pain in her lower back, hips, and legs.  Holden stated that
  her condition was about "30% better than it was" and the medication was "making it
  tolerant."  She stated that she had been on Vicodin for 8 years or even more.  She
  mentioned that was no longer seeing Dr. Graham but that she had started to go to Dr.
  Raka  C.  Gohel,  a  pain-management  physician.    Dr.  Gohel  had  prescribed
  antidepressants as well as Lortab, Vioxx, Ultram, Mirtazapine, and Tizandine and had
  instructed Holden not to lift more than ten pounds.  Holden reported that she could do
  light  housework,  such  as  a  few  loads  of  laundry  (but  not  unloading  the  washer),
  cleaning the toilet, making the bed (on her knees to avoid bending), light grocery
  shopping, cooking, and vacuuming once a week.  She could drive about 10 miles at
  a time and could go to a movie if she took pain pills in advance.  She could handle
  personal hygiene without assistance.  She reported spending about 15 minutes a day
  on the computer to check emails and search the internet.  She reported spending most
  of the day lying on a recliner and watching television. She could sit for about 30
  minutes and stand for about 20 minutes, could drive for about 10 miles.  Holden
  asserted that she could not work because she could not sit for extended periods.  (*Id.*
  at 691-93).

- **January 12, 2004**:  Dr. Gohel, a pain-management physician who treated Holden after the 2003 surgery to remove the hardware from her back, submitted a Physician Statement to IDR.  Dr. Gohel stated that Holden could not use her upper extremities for repetitive tasks and had little sustained tolerance to sitting, standing, and walking.  (*Id.* at 630–31).  Dr. Gohel stated that Holden could use her right hand but not her left for simple grasping and could not do any pushing, pulling, or fine manipulation.  She stated that Holden could use both lower extremities for repetitive movements, could frequently and continuously lift less than ten pounds and occasionally more, and had "sustained tolerance to sit/stand and walk" each for fifteen minutes to one hour.  (*Id.* at 628-630).

- **February 16, 2004**:  An MRI examination conducted at Dr. Gohel's request showed a solid fusion and "maintained" alignment, with no evidence of significant spinal stenosis, neural foraminal narrowing, or nerve-root impingement.  (*Id.* at 664-65).

- **March 30, 2004**: In an office visit to Dr. Gohel, Holden reported that the medication regimen had provided her "50-60%" pain relief.  Dr. Gohel noted no progressive neurological changes.  Dr. Gohel recommended that Holden follow up with a psychiatrist.  The prescriptions for pain and muscle relaxant and antidepression drugs continued.  (*Id.* at 666).

- **May 11, 2004**: Thurston, the IDR nurse clinical-care manager, wrote a memorandum summarizing the documents in Holden's file and performed a claim review.  Thurston noted that Holden continued to complain of ongoing low back pain and leg pain.  Dr.

Graham had estimated at the time of the June 2003 surgery that full recovery would not be expected until January 2004.  Thurston also noted Dr. Graham's statements that Holden had a dependence on narcotics and should undergo a drug-rehabilitation program, followed by Holden's change from Dr. Graham to Dr. Gohel.   The assessment concluded that Holden's "home activities of grocery shopping, laundry, cleaning toilet, vacuuming and doing own ADL's demonstrates a greater functional reserve than is stated.  PCA per Dr. Gohen appears overly restrictive."  (*Id*. at 691-93).

The same day, IDR sent Dr. Gohel a letter asking her to "clarify [Holden's] work capacity."  The letter restated the Thurston's findings and asked Dr. Gohel to consider whether Holden would be able to do any type of work:

> Dr. Gohel, we (her long term disability insurer) are at the point in Ms. Holden's contract where we are looking at her capacity to perform any type of occupation, not just her own occupation. . . . From her description of her home activities, it seems that the most important accommodations would be the ability to alternate sit/stand as she needs to and to avoid lifting > 10 lbs.

> It is noted that she does have chronic pain complaints, however it seems that she has functioned quite well at home with some accommodations.  It is reasonable to presume that she does have the ability to return to work with specific accommodations.

(*Id*. at 696-97).  Holden received a copy of the letter sent to Dr. Gohel.

- **June 18, 2004**:  In response to IDR's letter, Dr. Gohel informed IDR that she agreed that Holden had the ability to return full-time to her own occupation or work full-time in a different occupation.  (*Id*. at 702–08).

9

• **June 19, 2004**:  In response to the letter sent to Dr. Gohel, Holden sent a letter to Thurston stating that "false information was sent to [Dr. Gohel] with the intent that she would get the impression that I could perform all these things on a daily basis, and with that, she would approve me to return to work."  Holden's letter stated:

> I do not know where the customer service reps I spoke to got that I did all this work on a daily basis.  I cannot physically do that. . . .
>
> When I do laundry, my 15 year old son, and my husband help me by carrying the baskets down stairs and putting the basket where I do not have to bend to get the clothes out.  When the washer is done, I put them in the dryer and I have to squat instead of just leaning over and throwing them in the dryer, which is difficult, as I do not have the balance to do this for long.  After taking the clothes out, if they are home, my family carries the basket in so I can fold them.  If no one is home, I take a few clothes in at a time, . . . I do 1 or 2 very small loads a day.
>
> I do not do work on the computer, the reps were told that I check my emails usually every other day, but even using the mouse or typing a response, within 5–15 minutes my neck and shoulders tighten up and I have burning sensations and shooting pain, in the neck and shoulder regions. . . .  Even doing this letter is extremely painful to my neck, shoulders and lower back.  I have to stop typing and get out of my chair (which is an ergonomic chair) after a very short time. . . .
>
> I try to vacuum once a week, I do not always get it done, if I already have severe pain in my lower back, I do not whis [sic] to make it worse.  I have a self driven vacuum, therefore I do not really have to push it, I basically stear [sic] and, turn it around, if this was not self drivin [sic] I do not think I could do it, as even doing this my back will hurt the rest of the day. . . . I only do one room in a day. . . . My family does the upstairs as I cannot carry the vacuum up, it weighs 25 lbs.

10

> In regard to grocery shopping, I only run to the store and get what I need for supper if I have nothing in the house, my husband does the heavy grocery shopping, not me.  I usually have to talk myself into even going as standing for longer than 10–15 minutes, I am almost in tears . . . .
>
> In addressing cleaning the toilet, this is maybe once a week and I have to sit on the floor to clean the  bowl, as I cannot lean over, while sitting or squating.
>
> Yes I do drive, however, the only time I drive any distance (10–14 miles away) is to go to Dr appointments.  Driving also hurts my back/legs and neck/shoulder regions.
>
> When I make the bed, I have to get on my knees as again, and again, I cannot lean over.

(*Id.* at 718–20).   Holden also complained that Dr. Gohel was not sufficiently "aggressive" with her treatments.  Holden had scheduled an appointment with a different pain doctor who was an accupuncturist.

Thurston did not view the letter from Holden as stating that she was unable to perform the housekeeping duties.  Instead, the letter confirmed that "while [Holden] can do all the activities stated in the letter, she has to pace herself to do them."  (*Id.* at 713).

• **June 22, 2004**:  Holden returned to see Dr. Graham, who wrote a description of the visit.  Dr. Graham stated that "the patient returns after a lengthy absence in order to discuss her disability status.  She has been under the care of Dr. Gohel.  Apparently, Dr. Gohel discharged her, and recommended that she return to work.  However, the patient does not think she is physically capable of performing her old job."  Dr.

11

Graham stated that "there are probably many jobs which she would not be able to perform because of her impairment" but "that she might be able to perform some type of light duty job, depending on the situation."   Dr. Graham "recommended a functional capacity evaluation ("FCE") in order to determine what type of work she is able to perform, if any."  (*Id*. at 726).  Dr. Graham's findings were communicated to IDR in a telephone call on July 25, 2004.  (*Id*. at 723).

- **July 28, 2004**: Dr. Anna Dixon, a chiropractor, performed an FCE on Holden at the request of Dr. Graham.  Dr. Dixon's report stated:

> Based on the data analysis of Ms. Holden's FCE results, it does not appear that Ms. Holden currently possesses the ability to return to full time employment at this time. . . .  Ms. Holden demonstrates a significant fear of re-injury and pain focused behavior.  It is therefore recommended that Ms. Holden be considered for entry into a chronic pain management program that places equal emphasis on both physical and psychological re-conditioning for the restoration of function and appropriate pain coping skills.   Additionally, it is the opinion of this examiner that Ms. Holden should be evaluated for possible intervention for what appears to be a documented dependence on pain medication.

(*Id*. at 735).

- **August 24, 2004**:  Thurston wrote a memorandum documenting her claim review. She noted the conclusion from the FCE that Holden had a "significant fear of reinjury and pain focused behavior" and the recommendation that these behaviors be addressed in a pain management program and intervention for her drug dependency. Thurston expressed concern that the FCE was "not a clear indicator of what claimant

12

is functionally able to do" because it stressed "claimant's subjective pain fears rather than her abilities.  It does not appear that there was any testing for ability to sit/stand or walk. . . .  Further comment r/t claimant's occ is deferred to voc."  Thurston concluded that if Holden completed a rehab program, there was a basis to expect that Holden could return to work in three to six months.  Thurston suggested a plan of action that included verifying that the rehabilitation program had been set up, obtaining ongoing office notes, labs, and diagnostic data, and then "consider[ing] objective testing of claimant's functional ability to" return to work.  (*Id*. at 751-52).

• **February 11, 2005**:  An MRI conducted at the request of Dr. Razik Saqer, Holden's second pain management physician, showed a "fairly solid appearing fusion from L4 to L5"; "minimal bulging above the fusion L3-4 accompanied by facet arthropathy more so on the left with a small degree of left lateral recess narrowing without nerve root deformity seen"; and "facet arthropathy left greater than right at L5-S1."  (*Id*. at 912-913).

• **February 22, 2005**:  IDR required Holden to undergo an Independent Medical Evaluation ("IME").  Dr. Michael Krebs conducted the IME.  Dr. Krebs concluded that Holden was probably physically capable of returning to work.  He added, however, that Holden had psychological problems that posed a barrier to resuming "competitive, gainful employment," and that there was "no question" that Holden was dependent on pain medication.  Dr. Krebs's report stated, in relevant part:

    1. Claimant's Current Functional Capacity

Based on my physical examination and the claimant's observed behavior it is my opinion that the claimant is capable of functioning at the sedentary physical demand level and could conceivably return to work at that level at the present time. I found no evidence of objective impairment which would prevent the claimant from returning to work at the sedentary level. However, the claimant's tolerance of subjective pain may limit her performance and cannot be predicted by any reliable objective means. . . .

### 3. Anxiety–Depression and Return to Work Prognosis

The claimant's psychological state figures greatly in her reluctance to return to work. She presents herself as completely disabled and has long-standing chronic pain behaviors which would be difficult to extinguish. No doubt secondary gain factors play a large role in the perpetuation of her pain. I am pessimistic with regard to the claimant's return to work on a sustainable or predictable basis. She would have to be open to committing herself to psychologically based, behavior modification program stressing physical conditioning in order to prepare herself to return to competitive, gainful employment. Her past behavior does not seem to indicate that she would do so.

### 4. Appropriateness of Present Medical Care and Narcotic Dependency

The present medical care consisting of pharmacological management of symptoms by a pain specialist and a psychiatrist appears appropriate and medically necessary. There is no question that the claimant is dependent on opiate analgesics for the relief of her pain. The use of opiates in the control of chronic benign musculoskeletal pain is appropriate in the claimant's case. Non-narcotic medication alone is unlikely to provide adequate pain relief. The use of opiates on a permanent basis does not categorically impair functional performance at work or activities of daily living when the object is pain relief. Potential addiction issues might be addressed by the claimant's psychiatrist.

14

> 5. Validity of the FCE of 7/28/2004
>
> I do not place much value in the concept of the FCE for determining the objective work capacity of individuals with chronic pain disorders associated with psychological factors because of the FCE's reliance on subjective effort.  I do not think that performing another FCE is liable to provide any more useful information.
>
> The claimant is unlikely to put forth greater effort than she demonstrated on 7/28/2004.  The medical history and IME physical exam are sufficient to arrive at an estimate of work capacity.

(*Id*. at 780-84).

• **March 21, 2005**:  IDR received Holden's medical records from Dr. Saqer.  (*Id*. at 788-829).  Dr. Saqer's records from September 7, 2004 stated that after several steroid injections, Holden was experiencing "100% improvement" in numbness and pain.  (*Id*. at 800).  On November 29, 2004, Dr. Saqer reported that Holden was anxious, shaky, and crying, reporting "family stressors" that were contributing to her medical condition.  Dr. Saqer suggested a psychiatric examination.  Holden began psychiatric counseling on December 13, 2004.  (*Id*. at 819-820).  Dr. Saqer learned for the first time on January 24, 2005 that Holden had been participating since 2004 in a drug rehabilitation program for Soma dependence.  (*Id*. at 826).

• **April 7, 2005**:  At IDR's request, Dr. Lori Cohen, a psychologist, reviewed Dr. Krebs's IME, spoke with Dr. Krebs, and reviewed some of the data provided by Dr. Graham and Thurston.  Dr. Cohen noted Dr. Krebs's conclusion that based on her

physical status, Holden was capable of resuming a sedentary occupation.  Dr. Cohen emphasized as well that there was too much missing information to determine whether Holden "suffers from a psychiatric condition and whether or not this condition rises to the level of impairment."  Dr. Cohen reported that Dr. Krebs "agreed that he did not have sufficient data and does not have sufficient training to opine as to what psychological factors are affecting Ms. Holden's functional capacity and to what degree these factors might be affecting her work capacity. . . .  He recommended that a comprehensive psychological evaluation might help to determine the degree to which her psychological status may be a barrier to resuming work and for treatment planning."  (*Id*. at 842-44).

- **April 26, 2005**:  IDR received medical records from Dr. Ginsberg, a psychiatrist treating Holden.  The records showed that she was experiencing increased anxiety but no mood swings or depression.  (*Id*. at 868-870).

- **June 23, 2005**:   Holden was scheduled to have a physician conduct a neuropsychological examination at her home, "to determine if from a psychological standpoint [she] was truly impacted to a degree that would limit [her] ability to perform [her] own or another occupation at this time."  (*Id*. at 895).  The examination was requested because the record, including Dr. Graham's report, Dr. Gohel's report, the FCE of July 2004, and the IME of February 2005, showed that from a physical standpoint, Holden was capable of functioning in a sedentary job consistent with her former occupation.   However, an underlying psychological issue might be

16

"contributing to [her] overall reported loss of functioning." (*Id*.).  Holden had

rescheduled the first two appointments and, according to the psychologist, refused to

submit to the third scheduled examination.  The psychologist stated that Holden

"refused to allow me . . . to provide any exam findings to IDR and said she would not

consent to psychological testing, saying she had seen a psychologist and the psych

complaints were not part of her disability." (*Id.* at 890).

- **June 27, 2005**:  IDR sent Holden a letter notifying her that her benefits would be

  terminated on July 7, 2005.  The letter discussed the medical opinions and reports that

  had been submitted to IDR about Holden's physical ability to return to work.  The

  letter concluded:

> Ms. Holden, as communicated to you on
> 6/24/2005, the results of both your FCE of 7/2004
> and your IME results of 2/2005 indicate there is
> an underlying psychological factor playing a role
> in your current level of functioning.
> Unfortunately in order to determine what level, if
> any impairment exists formal neuropsychological
> testing is needed, and due to the lack of
> cooperation on your behalf, no testing has been
> completed.  Since we are unable to determine
> what if any liability exists on your claim, no
> further benefits will be issued, and your claim is
> now closed.

(*Id.* at 896).  Holden was advised of her appellate rights and filed an appeal. (*Id*. at

890-898).

- **July 20, 2005**:  Holden wrote to IDR's Appeals Department protesting the denial of

  her benefits.  She insisted that she was in terrible constant pain and had been "ever

since my back surgery." She also stated that she had changed pain doctors and was seeing a psychiatrist. She listed numerous medications she was taking, including for pain, for panic attacks, for anxiety, for sleep, and muscle relaxers. She admitted to refusing the IDR-requested psychiatric evaluation and explained that she thought it would only be "to the insurance advantage." She stated that she would not agree to have the examination without certain preconditions, to which the doctor could did not agree. These included crossing out portions of the contract that the examiner would not be held responsible for any medical or legal matters that might result from the evaluation. Holden said that "I marked that out because if my disability [insurance] was going to use that then they need to be held responsible for their statements." (*Id*. at 938-40).

- **August 2, 2005**: Holden saw Dr. Graham. He reviewed the recent MRI and CT scan. Dr. Graham noted that Holden's symptoms had continued without change and that there was no indication for surgical treatment. He proposed extensive patient education and follow-up with her pain-management doctor. (*Id*. at 1041).

- **August 4, 2005**: IDR notified Holden that it had reviewed her request for reconsideration and determined that benefits would be reinstated retroactive to July 7, 2005, but without admitting liability. "The information currently contained in your file indicates that your presentation is complex, involving both physical and psychological factors; the extent to which either may impair you, has not been defined." IDR stated that it was referring her file to two specialists: a clinical

18

psychologist and a psychiatrist certified in physical medicine and rehabilitation and electrodiagnostic medicine with a subspecialty certification in pain medicine. (*Id*. at 959).

- **August 8, 2005**:  IDR referred Holden's file to Dr. Barry Gendron, a specialist in physical and rehabilitative medicine, to review her claim of physical disability. (*Id*. at 1042-47).

- **August 18, 2005**:  Dr. Gendron issued a report stating that "[t]here is no data to suggest that the claimant on a physical basis would be unable to sustain activities at a sedentary level with lifting up to twenty pounds," and that "[i]t is obvious . . . from the physical data in the file of a solid fusion, ADL/avocational activities supportive of functional reserve, several treating physicians opining that the claimant can return to work (Gohel, Graham, and Saqer), and an FCE demonstrating some capacity in the light range that this individual should be physically capable of sustaining activities at a sedentary level."   Dr. Gendron stated that although "[t]he FCE indicated the claimant could not return to work full time, . . .   Dr. Saqer has clarified that her inability to [return to work] is based on her psychological, not her physical diagnosis." (*Id.* at 1053-1061).

- **August 25, 2005**:  Dr. Gendron sent Dr. Saqer a letter to confirm several facts that Dr. Saqer had conveyed during a telephone conversation about Holden.  The letter stated that Holden was physically capable of performing sedentary work activities; that every time progress was being made in controlling Holden's physical pain, she had

a new complaint; and that she had significant psychological issues and domestic issues that would preclude her from returning to work.   (*Id.* at 1049-1050).

- **October 28, 2005**:  Dr. Cohen issued a report in response to IDR's request to review the most recent information relevant to Holden's claim from a mental health perspective.  Dr. Cohen stated:

> [T]hough there are certainly references in the file to Ms. Holden suffering from psychiatric symptomology of many years' duration and though it is possible that her psychiatric symptoms play a role in her not yet having resumed employment, the data does not substantially support that Ms. Holden's psychiatric symptoms interfere with her capacity for functioning occupationally.  The data is scant with respect to how symptoms affect her capacity to function non-occupationally and on a day-to-day basis.

(*Id.* at 1065-1071).

- **December 1, 2005**:  IDR sent Holden a detailed letter notifying her that her first appeal was denied.  The letter reviewed the information in Holden's medical file going back to 2001.  It also included a reference to the employer statement that identified Holden's occupation as a Customer Service Representative and listed its physical demands.  The letter stated that a vocational consultant had reviewed Holden's file and had reviewed the Dictionary of Occupational Titles classification of the physical demands of a Customer Service Representative.  The classification stated that the occupation required sedentary physical demand with lifting, carrying, pushing and pulling 10 lbs occasionally, with mostly sitting; that the occupation could involve standing or walking for brief periods; and that it would require frequent

reaching, handling, and fingering.  The letter concluded by stating that based on the medical information, "there is no supporting documentation of your inability to perform your sedentary occupation from an emotional or physical standpoint on a full-time basis, therefore, you no longer satisfy the definition of disability."  (*Id.* at 1073–79).

- **January 26, 2006**: Leena Sheth, an occupational therapist, performed an FCE on Holden at the request of Dr. Saqer.  Sheth's report stated that Holden could sit for less than 20 minutes, stand for 15 minutes, and intermittently stand, sit and walk for 30 minutes.  It noted that Holden demonstrated the ability to lift 10 pounds and carry ten pounds of 30 feet, but that she voluntarily stopped the lifting test due to pain.  She also voluntarily stopped the treadmill test due to pain.  The report concluded that Holden did "not demonstrate the ability to work even at a sedentary level."  (*Id.* at 1092-93).

- **February 15, 2006**: Holden filed a second appeal.   (*Id.* at 1123).

- **March 31, 2006**: Holden was notified that Reliance Standard Life Insurance Co. had purchased the assets of IDR and that her appeal had been forwarded to Reliance Standard.  Holden refused to allow Reliance Standard to arrange for her to undergo a psychological evaluation as part of the review of her second appeal.  (*Id.* at 1136).

- **April 24, 2006**:  Reliance Standard referred the case to an outside peer reviewer, Dr. Philip Marion, who specialized in pain medicine.  (*Id.* at 1152).

- **May 1, 2006**:  Dr. Marion submitted a report stating concluding that Holden was likely capable of returning to light sedentary work.  The report stated, in relevant part:

> In the absence of her psychiatric condition, the claimant should be permanently restricted to light duty to sedentary duty occupational activities.  Maximal lifting should be no more than 20 pounds occasionally and 10 pounds frequently.  There should be no significant crawling, stooping, crouching, kneeling, squatting or climbing activities.  Due to her current use of narcotic opioid medications, she should be prohibited from working at unprotected heights or driving a company motor vehicle. . . . Her objective impairment supports significant occupational restrictions.  However, her stable radiological findings, neurological examination and functional independence are inconsistent with her claim of total incapacity.  In the absence of her psychiatric diagnoses, her treating physicians and independent medical reviewers concluded the claimant is functionally capable of working at the modified light to sedentary occupational level.  This Medical Reviewer is inclined to agree.

(*Id.* at 1155-59).  Dr. Marion received additional clinical notes from Dr. Saqer on May 8, 2006.  Dr. Marion stated in a May 15, 2006 supplemental report that this additional information did not alter the opinion stated in his May 1, 2006 report.  (*Id.* at 1191).

- **May 2, 2006**:  Reliance Standard obtained a Residual Employability Analysis from Jody Barach, a vocational rehabilitation analyst.  Barach concluded from Holden's employment history that Holden had transferable skills that could be used in several sedentary positions, including her former occupation as a Customer Service Representative.  (*Id.* at  1177).

- **May 16, 2008**:  Reliance Standard sent Holden a letter notifying her that her second appeal was denied.  The letter stated that the evidence in the medical file showed that

22

Holden was able to perform work at the sedentary level, and that "based on our review of the claim file, which included Dr. Marion's medical assessment that you are 'functionally capable of working at the modified light to sedentary occupational level' and our vocational expert's assessment that there are occupations within the general economy that you are capable of performing, we conclude that IDR's decision to deny benefits was valid." The letter also stated that "it is unclear why IDR chose . . . to pursue the issue of psychological impairment relevant to your claim for disability benefits" because Holden had already exceeded her allowed benefits for disability due to psychological impairments. (*Id.* at 1192-98).

This litigation followed. The administrative record was filed and the parties filed cross-motions for summary judgment.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine

23

issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "'An issue is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)). "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little*, 37 F.3d at 1075 (internal citations omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted)

### III.    The Claim of ERISA Procedural Violations

Holden asserts that she was denied a full and fair review of her claim because the original reason given for the denial was different from the reason given for the denial following the administrative appeal.[2]  (Docket Entry No. 27 at 20-21).  Fort Dearborn argues that although the final denial did include an additional reason for the decision, this additional reason was consistent with the original basis for denial and was not a "post-hoc rationalization."  (Docket Entry No. 29 at 9-10).

Section 1133 of ERISA provides that an employee benefit plan must:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133 (2008).

"Challenges to ERISA procedures are evaluated under the substantial compliance standard."  *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 392 (5th Cir. 2006) (citations omitted).  "This means that '[t]echnical noncompliance' with ERISA procedures 'will be excused' so long as the purposes of section 1133 have been fulfilled."  *Id.* at 393 (quoting *White v. Aetna Life Ins. Co.*, 210 F.3d 412, 414 (D.C. Cir. 2000)).

---

[2]Holden also initially asserted that the vocational analysis was not part of the administrative record, (Docket Entry No. 27 at 10, 20–22), but she later conceded that the vocational analysis was included in the administrative record, (Docket Entry No. 30 at 6).

"[S]ection 1133 requires an administrator to provide review of the specific ground for an adverse benefits decision." *Id.*  "When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir. 2006).

Holden argues that the initial reason given for the denial of benefits was her failure to submit to a psychological evaluation, but the reason given for the final denial was that she was physically capable of working in sedentary or light-duty occupations. (Docket Entry No. 27 at 20).  The record does not support this argument.  The initial denial letter stated that Holden was not eligible to receive continued benefits because her medical file showed that she was physically capable of sedentary employment.  The letter also stated that IDR was unable to determine the impact of any psychological condition as a result of Holden's refusal to submit to a psychological evaluation.  The letter stated that "[t]he conclusion drawn for the IME is, from a physical standpoint you are capable of functioning at a level that is consistent with that of your former occupation. . . .  [T]he results of both your FCE of 07/2004 and your IME of 02/2005 indicate there is an underlying psychological factor playing a role in your current level of functioning.  Unfortunately in order to determine what level, if any impairment exists formal neuropsychological testing is needed, and due to the lack of cooperation on your behalf, no testing has been completed." (Admin. Rec. at 895-96).  Holden had, and took, a full opportunity to respond to this explanation of benefits termination.  On appeal, the reason for the denial of continued benefits was again that the

26

information in the file showed that Holden was physically capable of sedentary employment. (*Id.* at 1192-98).

Holden was afforded a full and fair review of her claim.  Fort Dearborn is entitled to summary judgment on this issue.

## IV.    Holden's Claim of Wrongful Denial of Benefits

### A.    The Standard of Review

#### 1.    The Parties' Contentions

The parties disagree over the proper standard of review.  Holden argues that this court should review the decision that she was not eligible for continued long-term benefits *de novo*. Holden argues that the Plan neither granted discretionary decisionmaking authority to Fort Dearborn nor expressly provided any procedure to delegate any such authority to third parties such as IDR or Reliance Standard.  (Docket Entry No. 30 at 10).  Holden argues that because Fort Dearborn clearly delegated discretionary decisionmaking authority to determine benefit eligibility to an unauthorized third party, this court must review the decisions by those unauthorized parties under a *de novo* standard.  (Docket Entry No. 29 at 3-4).  Holden further argues that Fort Dearborn, in its dual role as insurer and decisionmaker, had a conflict of interest that, under the Supreme Court's recent decision in *Metropolitan Life Insurance Co. v. Glenn*, --- U.S. --- , 128 S.Ct. 2343 (2008), affects the standard of review.

Fort Dearborn responds that an abuse-of-discretion standard should apply.  Although it concedes that "the plan does not confer discretionary authority, per se" on Fort Dearborn, it urges that the real issue on appeal in this case is the factual determination of disability.

27

(Docket Entry No. 29 at 2-3).  For Dearborn argues that in the Fifth Circuit, even if plan documents do not expressly confer discretionary authority on plan fiduciaries, the factual findings of plan administrators are reviewed for abuse of discretion, not *de novo*.  Fort Dearborn asserts that this more deferential standard of review should apply to the findings of fact made by IDR because it made factual determinations of benefit eligibility as Fort Dearborn's agent.  (*Id*. at 3-4).

### 2.    Analysis

To determine the applicable standard of review, this court must first determine whether the decision Holden is appealing is an interpretation of the meaning of a Plan term or benefit or is a factual determination of benefit eligibility.  The record also requires a determination of whether the standard of review changes because of the absence of language authorizing Fort Dearborn to make discretionary decisions or to delegate to third parties authority to make such decisions.  The court must also determine whether Fort Dearborn has a conflict of interest that affects the standard of review.

#### a.    *Factual Determination or Plan Interpretation*

Holden characterizes this suit as turning on the construction of the term "disabled, as that term is used in the Plan and policy of insurance."  (Docket Entry No. 1 ¶ 9).  Fort Dearborn counters that this suit turns on the factual determination that Holden was physically capable of performing sedentary work for which she was "reasonably fitted taking into consideration training, education or experience" and therefore not entitled to receive disability payments after 24 months.  (Docket Entry No. 29 at 3).

A determination that a beneficiary is not disabled is "more factual in nature than interpretive in nature." *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 598 (5th Cir. 1994).  When, as here, a plaintiff challenges the finding that she no longer meets the definition of disability under the Plan, the challenge is to the factual finding that the plaintiff was not able to perform all the essential functions of gainful employment for which she is "reasonably fitted taking into consideration training, education or experience." (Admin. Rec. at 5).  *See Ducre v. SBC-Southwestern Bell*, No. 04-835, 2007 WL 128900, at *12 (W.D. Tex. Jan. 12, 2007); *see also Jones v. Lumbermans Mut. Cas. Co.*, No. 4:94-007, 1995 WL 1945568, at * 6 (N.D. Miss. Mar. 1, 1995) ("Guided by the holding in *Pierre*, the court is of the opinion that the decision to terminate plaintiff's benefits was based on a *factual determination* that Jones was no longer totally disabled within the meaning of the policy." (emphasis added)).

The issues in this case turn on the factual determinations that Holden was no longer disabled under the Plan and was able to return to work.  The challenged decision to terminate her long-term disability benefits is not one of Plan interpretation but rather a factual finding of no disability.

### b.    The Standard of Review

ERISA requires a district court to review determinations made by employee benefits plans, including employee disability plans.  *See* 29 U.S.C. § 1132(a)(1)(B); *Baker v. Metro. Life Ins. Co.*, 364 F.3d 624, 629 (5th Cir. 2004).  If a plan document expressly confers on the plan administrator the authority to determine benefits and construe the plan terms, that is

sufficient to invoke the arbitrary and capricious standard of review.  *See Bruch*, 489 U.S. at 115.  In some circuits, unless this *Bruch* language is in the plan documents, the more demanding *de novo* standard of review is applied to the plan administrator's decision, whether it interprets plan terms or makes factual determinations.  *See, e.g.*, *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249-250 (2d Cir. 1999); *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1182-84 (3d Cir. 1991); *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993); *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 379 n.2 (7th Cir. 1994).  In the Fifth Circuit, however, even if the plan does not expressly give the decisionmaker discretionary authority, "for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard."  *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir. 1991); *see also Vercher v. Alexander & Alexander,* 379 F.3d 222, 226 (5th Cir. 2004); *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 597–98 (5th Cir. 1994); *Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 100–01 (5th Cir. 1993).

In *Pierre*, the court explained that it was deciding whether the Supreme Court's holding in *Bruch* "encompasses a holding that *de novo* review is required of *factual determinations* by ERISA fiduciaries."  932 F.2d at 1556.  The court explained that *Bruch* had limited its holding to denials of benefits based on plan term interpretations.  The court stated:

> Fully acknowledging the Supreme Court's conclusion with respect to plan term interpretations, we nonetheless must recognize that before benefits are paid or denied, a plan

> administrator has to make determinations that may be divided
> into two general categories. First, he must determine the facts
> underlying the claim for benefits. *See Makar v. Health Care
> Corp.*, 872 F.2d 80, 83 (4th Cir. 1989) (plan fiduciaries are
> responsible for assembling a factual record which will assist a
> court in reviewing the fiduciaries' actions). Second, he must
> then determine whether those facts constitute a claim to be
> honored under the *terms* of the plan. *See generally Dennard v.
> Richards Group, Inc.,* 681 F.2d 306 (5th Cir. 1982). *Bruch*
> addressed the proper standard of review that is to be given to the
> plan administrator's second determination. *Bruch* did not speak
> to the first.

*Id.* at 1557. The *Pierre* court concluded that it is "completely consistent with the principles

of trust law to apply a different standard of review to each of these categories of decisions."

*Id.* The court emphasized ERISA's definition of fiduciary as one who "'exercises any

discretionary authority or discretionary control respecting management of [a] plan or

exercises any authority or control respecting management or disposition of its assets,'" *id.*

(quoting 29 U.S.C. § 1002(21)(A)(i)); has "'authority to control and manage the operation and

administration of the plan,'" *id.* (quoting 29 U.S.C. § 1102(a)(1)); and who "'must provide

a full and fair review'" of claim denials, *id.* (quoting 29 U.S.C. § 1133(2)). The court

concluded that an ERISA trustee, including a plan administrator, has inherent discretion that

includes "passing on issues of fact that determine individual eligibility for benefits." *Id.* at

1558. These factual determinations are owed a deferential review, even if the benefit plan

does not give the administrator or fiduciary discretionary authority to make such

determinations. *Id.*; *see also Vercher,* 379 F.3d at 226 ("[I]n Pierre, we held that even where

the plan does not expressly give the administrator discretionary authority, 'for factual

determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard." "[A] plan administrator's factual determinations are always reviewed for abuse of discretion; but its construction of the meaning of plan terms or plan benefit entitlement provisions is reviewed de novo unless there is an express grant of discretionary authority in that respect, and if tehre is such then review of those decisions is also for abuse of discretion.") (quoting *Pierre*, 932 F.2d at 1562).

The Plan documents state that Fort Dearborn has the authority to determine "the extent of any Sickness or Injury for which you have made a claim." (Admin. Rec. at 12). Although no Plan language in the record expressly confers on Fort Dearborn the discretion to determine benefits or construe the Plan terms, under Fifth Circuit authority, because Fort Dearborn is the insurer and Plan administrator, its factual findings that Holden was no longer eligible for long-term disability benefits are reviewed for abuse of discretion, not under a *de novo* standard.

### c.   *The Standard of Review Applicable to IDR's Findings*

In 2003, Integrated Disability Resources ("IDR") replaced CSI as Fort Dearborn's claims advisory agent. On February 20, 2003, Holden received a letter from Integrated Disability Resources ("IDR") stating that "[w]e are the claims advisory agent for Fort Dearborn Life Insurance Company."  The letter stated that IDR was reviewing Holden's disability status to determine her eligibility for continued benefits beyond April 7, 2003, 24 months after the date she began receiving benefits. (Admin. Rec. at 495).  The administrative record does not contain the agreement between Fort Dearborn and either CSI or IDR under

32

which IDR became Fort Dearborn's "claims advisory agent" assisting in evaluating claimants' benefit eligibility.  Yet it is clear from the administrative record that IDR was charged with investigating claims and making disability determinations under the Plan, even if Fort Dearborn issued the checks and continued to be "an integral part of overall claim handling," (*id.* at 459, 495), and even if, on appeal, Reliance Standard – which purchased IDR's assets – did not exercise discretion in handling the appeal and "Fort Dearborn, as the insurer, retained final decision-making authority over all discretionary questions." (Docket Entry No. 10 at 2-3).

Section 1105(c)(1)(B) of ERISA states that "[t]he instrument under which a plan is maintained may expressly provide for procedures . . . for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan."  29 U.S.C. 1105(c)(1)(B); *see Chevron Chem. Co. v. Oil, Chem. and Atomic Workers Local Union 4-447*, 47 F.3d 139, 144 (5th Cir. 1995) (finding that plan administrator could delegate fiduciary responsibility because plan documents expressly provided for appointment of reviewer by administrator).  The circuits to address this issue have held that when an ERISA plan specifically authorizes its fiduciary to employ an independent third party to review benefit claims, even while reserving final authority to the fiduciary over benefits determinations, the standard of review that would apply to an act by the delegating fiduciary also applies to the acts of the party to whom the responsibility was delegated.  *See Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279, 1284-85 (9th Cir. 1990) (applying abuse of discretion review to findings by third

33

party to which authority had properly been delegated in plan documents); *Geddes v. United Staffing Alliance Employee Med. Plan*, 469 F.3d 919, 925-27 (10th Cir. 2006) (same).  The courts have divided as to whether the fiduciary may delegate authority only to other fiduciaries.  *Compare Geddes*, 469 F.3d at 927 (plan administrator may delegate to a nonfiduciary third party because the third party acts as an agent of the fiduciary; "[i]f a plan administrator has been allotted discretionary authority in the plan document, the decisions of both it and its agents are entitled to judiciary defererence.") *with Baker v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288, 291-92 (11th Cir. 1990) (holding that to qualify for abuse of discretion standard, an ERISA plan administrator that delegates its authority must do so only to other fiduciaries.).

The Fifth Circuit has not considered a challenge to a benefit denial in which the ERISA plan did not expressly authorize the plan administrator to delegate authority to a third party that had a critical role in making factual disability determinations.  In *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 266 n.3 (5th Cir. 2004), the court held that the insurer, Liberty, which had made the decision that the beneficiary was not eligible for long-term disability benefits, was a "fiduciary" under § 1002(21)(A) and entitled to the deferential abuse of discretion review.  The plan did not specifically designate a "plan administrator," making the designated "plan sponsor," Chase Manhattan Bank, the default "plan administrator."  Neither in the plan "or any other document" did Chase expressly delegate any authority to Liberty.  The Fifth Circuit stated that "without more, we would be required to review Liberty's interpretation of the plan de novo."  *Id*.  The court nonetheless concluded

34

that because Liberty was a fiduciary under ERISA vested with discretion to administer the plan, its factual determinations should be reviewed under the abuse of discretion standard. *Id*.

*Ellis* appears to endorse the cases from other circuits holding that unless plan documents expressly delegate authority to a third party, that party's decisions must be reviewed *de novo*. It is unclear, however, because the *Ellis* court stated that "without more," the lack of delegation authority meant that the court would have to review Liberty's "interpretation of the plan de novo." *Id*. This suggests that review of Liberty's *fact determinations* might proceed under an abuse of discretion standard even without language in plan documents authorizing the plan administrator to delegate authority to Liberty. *Ellis* did not involve a review of Liberty's fact determinations, but only its plan interpretation. The present case, unlike *Ellis*, involves review of fact determinations made by a third party when the plan documents do not authorize the delegation of authority to a third party.

*Ellis* cited with approval cases from other circuits applying *de novo* review to factual determinations by third parties without any express delegation of fiduciary duty in the plan documents. *See Rodriguez-Abreu v. Chase Manhattan Bank*, *N.A.*, 986 F.2d 580, 584 (1st Cir. 1993); *Madden*, 914 F.2d at 1283-84. But in these circuits, unlike the Fifth Circuit, factual determinations are not viewed as subject to an abuse-of-discretion standard of review in the absence of plan language vesting discretion in the plan administrator. In these circuits, factual determinations and plan interpretation decisions are both reviewed subject to *de novo* review unless the plan documents expressly confer discretionary authority to make such

determinations.  *See Anderson v. UNUM Life Ins. Co. of Am.*, 414 F. Supp. 2d 1079, 1097

(M.D. Ala. 2006); *Heller v. Cap Gemini Ernst & Young Welfare Plan*, 396 F. Supp. 2d 10,

19 (D. Mass. 2005).  The Fifth Circuit has not expressed an opinion, in dicta or otherwise,

as to whether section 1105(c) requires plan documents expressly to authorize delegation to

a third party to secure abuse-of-discretion review for factual determinations in which the

third party was involved.

There are Fifth Circuit cases in which factual determinations by third parties that have

contracted with plan administrators to conduct at least portions of the administrator's fact

finding duties are given the same abuse-of-discretion review as factual determinations by the

administrator.  In *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir.

1992), for example, the court rejected the plaintiff's argument that the plan administrator's

factual determinations should be given a more stringent standard of review because the

administrator contracted with a third party to conduct medical necessity reviews under the

plan despite the fact that the plan was silent as to delegation.  The court concluded that the

third party's factual determinations should be given the same standard of review as the

administrator's because the administrator reserved final authority to authorize or deny

benefits, and because the administrator in fact exercised that authority.  The court concluded

that "[a]s long as a company maintains the ultimate decision on denial of benefits, it can be

beneficial for it to have experienced agents assist in the determination."  *Id*.  There is no

indication that the court considered any challenge under section 1105(c).  Similarly, in

*Sweatman*, the Fifth Circuit applied an abuse-of-discretion review to factual determinations

36

by independent medical consultants who evaluated the beneficiary's records to determine whether they supported her physical limitations, and to factual determinations by a private investigator hired by the administrator to determine whether the claimant's neighbors and associates had observed behavior by the claimant consistent with her claimed disability. 39 F.3d at 601-02.   The court observed that these factual determinations were appropriate because the administrator made the ultimate decision as to whether to grant or deny benefits. *Id*. at 603.   Again, there is no discussion of section 1105(c).

The present case raises issues not present in *Salley* and *Sweatman*.   In both those cases, the court premised the more deferential standard of review on the fact that the administrator retained and *exercised* the right to make the final disability determinations under the plan.   In this case, the record is unclear as to what role Fort Dearborn, as the insurer, played in making the factual determination that Holden was no longer eligible for long-term disability payments.   There is no indication that Fort Dearborn was involved in making the factual disability determination in 2005.   In 2006, Reliance Standard, IDR's successor-in-interest, handled the second appeal.   Reliance Standard alleged in its unopposed motion to dismiss that it exercised no discretion in handling the appeal and that "Fort Dearborn, as the insurer, retained final decision-making authority over all discretionary questions," (Docket Entry No. 10 at ¶ 4), but the record does not reflect whether Fort Dearborn had a similar arrangement with IDR.   Holden's termination of benefits letter and appeal denial letters came directly from IDR and Reliance Standard.   Her appeals were processed through IDR's and Reliance Standard's appeals departments.   Letters to plan

members indicate that Fort Dearborn retained power to issue disability checks, but there is no other evidence as to the authority that Fort Dearborn retained or exercised.

In sum, there is insufficient evidence to determine whether Fort Dearborn retained or exercised final decisionmaking authority over the factual determination that Holden was no longer eligibility for long-term disability benefits.  There is no evidence in the record that the Plan expressly authorized Fort Dearborn to delegate its authority.   Whether *factual determinations* by a third-party are subject to *de novo* review or the more deferential abuse of discretion standard when delegation to third parties is not authorized by the plan documents and the third party plays an important role – and perhaps an exclusive role – in making eligibility decisions, is not addressed in the Fifth Circuit precedents.  Fort Dearborn concedes the absence of authority on this point but argues that "[n]othing in *Pierre*, or in any other Fifth Circuit precedent limits the discussion to plan fiduciaries."  (Docket Entry No. 29 at 3).

*Pierre* was based on what the Fifth Circuit characterized as the "inherent discretion" of an ERISA fiduciary under 29 U.S.C. § 1102(a)(1).  932 F.2d at 1562.  Section 1102(a)(1) states that every benefit plan must have "one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan."   The *Pierre* court concluded that this was a statutory grant of discretion to administrators in the "daily and routine management of plans."   The court characterized factfinding as part of this daily routine.  *Id.* at 1559.  Examining the ERISA statute in conjunction with common law trust principles, the court concluded that:

> RESTATEMENT (SECOND) TRUST § 186, read in conjunction with
> the ERISA principles contained in 29 U.S.C. § 1102(a)(1), leads
> us to conclude that this "necessary or appropriate" discretion
> includes passing on issues of fact that determine individual
> eligibility for benefits.  Consequently, under the principles of
> trust law, we owe the administrator's factual determination a
> deferential review.

*Id.* at 1558 (internal citations and footnotes omitted).

In *Pierre,* the Fifth Circuit also concluded that "a deferential standard for factual determinations is buttressed, if not compelled, by practical considerations." *Id.* at 1159.  It observed that "[i]n virtually all decisional review, some deference is given to the fact finder, whether it is a district court giving deference to an administrative body, or an appellate court giving deference to the district court." *Id.*  This deference is in large part a matter of utility: "*[D]e novo* review of factual determinations is a difficult and uncertain exercise on a cold record," and "no persuasive argument can be made that *de novo* review of an issue of fact is more reliable than a standard of review that respects the advantage of the fact finder while also protecting against abuse of the fact finder's power." *Id.*  Furthermore, the court stressed, according *de novo* review to factual determinations would encourage federal trials "in the vast numbers of claims that are filed in the thousands of ERISA plans throughout this country," which would overwhelm the courts "with mundane and routine fact disputes" and reduce the size of the fund from which benefits are paid. *Id.*

*Pierre*'s arguments for applying a deferential standard of review to factual determinations apply as much to factual benefit determinations by IDR, a "claims advisory agent," as to factual benefit determinations made by Fort Dearborn. *See, e.g.*, *Geddes*, 469

F.3d at 924 ("Like many managed-care providers, United devolves the administrative task of reviewing beneficiary claims to an independent, non-fiduciary third party."). *Pierre's* statutory argument does not apply as readily. The statutory argument is based on section 1102, which speaks only of the authority of fiduciaries named in the plan documents. A separate statutory provision, section 1105(c), states that "The instrument under which a plan is maintained may expressly provide for procedures. . . for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities . . . under the plan." 29 U.S.C. § 1105(c)(1). The plan documents the parties have submitted do not authorize such delegation.

This court concludes that there are insufficient facts on the record, and insufficient authority in the case law, to conclude that an abuse-of-discretion standard of review applies to factual determinations in which IDR had a significant role. This court will assess Holden's claims under both the abuse of discretion and *de novo* standards.

### d. Whether there is a Conflict of Interest

In its recent decision in *Metropolitan Life Insurance Co. v. Glenn*, 128 S.Ct. at 2348-350, the Supreme Court recognized a conflict of interest when the same party is responsible for both determining and paying benefits, including when a professional insurance company fills these dual roles. The Court concluded that a court must consider the conflict as "a factor" in its review of a benefit-denial claim. But a conflict does not require that the court conduct a *de novo* review when an abuse of discretion review would otherwise apply, or impose additional burdens of proof on the party with the conflict of interest. *Id.* at 2350-51. The

Court stated that the weight of a conflict of interest in the court's analysis depends on the extent of the conflict.  If, for example, "the administrator has taken active steps to reduce potential bias and to promote accuracy . . . by walling off claims administrators from those interested in firm finances," the conflict "should prove less important (perhaps to the vanishing point)."  *Id*. at 2351.

The gaps in the record in this case also complicate this court's conflict of interest analysis.  A potentially greater conflict of interest would exist if Fort Dearborn retained final authority to grant or deny benefits, because Fort Dearborn was also responsible for paying benefits under the Plan.  The extent of any conflict of interest would diminish if Fort Dearborn delegated the decisionmaking authority to IDR and Reliance Standard.  Because this court cannot determine the degree of the conflict, it cannot determine what weight to give the conflict as a factor in its analysis.  Because this court will assess Holden's claims under both the abuse of discretion and *de novo* standards, however, this issue need not be resolved.

### B.    Review Under Abuse of Discretion Standard

A review of the factual determinations in an ERISA case under the abuse-of-discretion standard requires "'due deference to the . . . factual conclusions that reflect a reasonable and impartial judgment.'"  *Vercher*, 379 F.3d at 231 (quoting *Pierre*, 932 F.2d at 1562).  If the determinations are "supported by substantial evidence and [are] not arbitrary or capricious, [they] must prevail."  *Ellis*, 394 F.3d at 273; *see also Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004) ("Evidence is substantial if it is reasonably sufficient to support a

conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary.").

This court concludes, after reviewing IDR's and Reliance Standard's factual determinations for abuse of discretion, that the factual determination that Holden was physically capable of resuming sedentary work for which she was reasonably fitted, and therefore was not disabled under the Plan, is supported by substantial evidence in the record. In assessing Holden's physical capabilities, IDR and Reliance Standard considered the opinions of eight medical professionals: six doctors, one chiropractor, and one occupational therapist. Of these medical professionals, five – Dr. Gohel, Dr. Graham, Dr. Saqer, Dr. Dixon and Leena Sheth – were retained by Holden herself and treated her. Three – Dr. Krebs, Dr. Gendron, and Dr. Marion – were experts retained by IDR or Reliance Standard. Among this group of medical professionals, there was an agreement that Holden was physically capable of resuming sedentary work.

IDR noted in making its disability determination that Holden's own treating physicians believed that she was capable of returning to a sedentary job to which she was reasonably suited, including her former position as a claims representative. (Admin. Rec. at 894-89, 1073-79). Dr. Gohel, one of Holden's pain management doctors, informed IDR that Holden had significant physical limitations but had the ability to return full time to her former occupation or a different similarly sedentary occupation. (*Id*. at 628-630, 702-08). Dr. Graham, Holden's back surgeon, noted that she had "chronic residual pain" and that there were "probably many jobs which she would not be able to perform because of her

impairment," but opined that "she might be able to perform some type of light duty job, depending on the situation." (*Id.* at 726). Dr. Saqer, Holden's other pain management physician, stated in August 2005 that Holden was physically capable of performing sedentary work, although he doubted that she was psychologically capable of returning to work. (*Id.* at 1049-050).

IDR further noted that the conclusions of Holden's physicians were confirmed by the opinions of medical professionals it engaged to review the file. (*Id.* at 894-89, 1073-79). Dr. Krebs, the specialist in physical medicine and rehabilitation who conducted Holden's IME, "found no evidence of objective impairment which would prevent the claimant from returning to work at the sedentary level." Dr. Krebs stated that Holden was "capable of functioning at the sedentary physical demand level and could conceivably return to work at that level at the present time," although "tolerance of subjective pain may limit her performance." (*Id.* at 782). Like Dr. Saqer, Dr. Krebs was concerned that Holden's psychological state would interfere with her ability to work. (*Id.* at 783).

Dr. Gendron, the specialist in physical medicine and rehabilitation who reviewed Holden's medical file in her first appeal, found that "[t]here is no data to suggest that the claimant on a physical basis would be unable to sustain activities at a sedentary level with lifting up to twenty pounds." He concluded that "[i]t is obvious . . . from the physical data in the file of a solid fusion, ADL/avocational activities supportive of functional reserve, several treating physicians opining that the claimant can return to work (Gohel, Graham, and Saqer),

43

and an FCE demonstrating some capacity in the light range that this individual should be physically capable of sustaining activities at a sedentary level." (*Id.* at 1060).

Dr. Marion, the pain medicine specialist who reviewed Holden's medical file in her second appeal, found that Holden's "objective impairment supports significant occupational restrictions. However, her stable radiological findings, neurological examination and functional independence are inconsistent with her claim of total incapacity. Dr. Marion stated that Holden's "treating physicians and independent medical reviewers concluded the claimant is functionally capable of working at the modified light to sedentary occupational level. This Medical Reviewer is inclined to agree." (*Id.* at 1156).

IDR and Reliance Standard also considered Holden's two FCEs, both of which indicated that she would not be able to return to work full time. In the first FCE, Dr. Dixon, a chiropractor who conducted the examination at the request of Dr. Graham, concluded that Holden's "significant fear of re-injury and pain-focused behavior" would be prohibitive. She recommended that Holden enter a "chronic pain management program that places equal emphasis on both physical and psychological re-conditioning," and that Holden be evaluated for "what appears to be a documented dependence on pain medication." (*Id.* at 735). In the second, Ms. Sheth, an occupational therapist who conducted the examination at the request of Dr. Saqer, found that Holden could sit for less than 20 minutes, stand for 15 minutes, and intermittently stand, sit, and walk for 30 minutes. Ms. Sheth concluded that Holden "did not demonstrate the ability to work even at a sedentary level." (*Id.* at 1092-93).

Holden argues that IDR and Reliance Standard abused their discretion in two respects. First, Holden argues that the FCE results, when viewed with somewhat equivocal statements by her own treating physicians and Dr. Krebs about her ability to work, provide substantial evidence that she was physically incapable of returning to sedentary work.  She claims that "all of the doctors and physical therapists who have actually treated or examined Mrs. Holden believe her to be unable to do even sedentary work.  The only evidence in the record contrary to the treating and examining sources comes from employees and hired reviewers, none of whom can add anything new to the record."  (Docket Entry No. 27 at 24).

The administrative record reflects that Holden's own treating physicians told IDR that she was physically capable of returning to sedentary work.  Although Holden challenged as inaccurate the information given to these treating physicians, the record shows that they were familiar with Holden and her history and condition and on several occasions told IDR that she was physically capable of returning to sedentary work.  And IDR and Reliance Standard took appropriate steps to weigh and assess the FCE results.  Concluding that the first FCE administered on July 28, 2004 "did not provide a clear picture or global assessment of [Holden's] functionality," IDR ordered an IME on February 22, 2005 with Dr. Krebs. (Admin. Rec. at 895).  IDR and Reliance Standard also had their experts review the FCE results.  Dr. Gendron noted that the first FCE "demonstrat[ed] some physical capacity into the light range that this individual should be physically capable of sustaining activities at a sedentary level."  He added that although "[t]he FCE indicated the claimant could not return to work full time, . . . Dr. Saqer has clarified that her inability to [return to work] is based on

45

her psychological, not her physical diagnosis." (*Id.* at 1060).  Also commenting on the first

FCE, Dr. Krebs stated that he did "not place much value in the concept of the FCE for

determining the objective work capacity of individuals with chronic pain disorders associated

with psychological factors because of the FCE's reliance on subjective effort." (*Id.* at 783).

Assessing the results of Holden's second FCE along with other information from her patient

history, Dr. Marion concluded that "[t]he claimant is functionally independent.  Her objective

impairments support significant occupational restrictions.  However, her stable radiological

findings, neurological examination and functional independence are inconsistent with her

claim of total incapacity." (*Id.* at 1156).  These experts' conclusions about the FCE results

are consistent with the opinions of Holden's treating physicians that if she was unable to

return to work, the reason was due to a psychological condition and not objective physical

limitations.

It is not an abuse of discretion for a plan administrator to rely on the conclusions of

physicians who have only reviewed a claimant's medical records without conducting a

physical examination of the claimant.  *See Gooden v. Provident Life & Accident Ins. Co.*, 250

F.3d 329, 335 (5th Cir. 2001); *Donato,* 19 F.3d at 380 (holding that a denial of benefits was

not an abuse of discretion when the "decision simply came down to a permissible choice"

between the positions of the administrator's medical consultants and the claimant's

physicians).  The record reveals that the conclusions of IDR's expert's were generally

consistent with those of her treating physicians; Holden might have psychological issues

affecting her ability to return to work, but there was no physical problem that would produce the pain that she asserted as the basis of her limitations.

Holden's second argument is that IDR in bad faith attempted to establish that her pain issues had a mental, rather than physical, cause, in order to benefit from the two-year Plan limit on disability caused by mental illness.  She claims that IDR's investigation into her psychological health "was actually a self-serving attempt by the administrator to convert chronic pain into an 'underlying psychological issue' and then to short-circuit some possible twenty years of benefits to two years . . . ."  (Docket Entry No. 27 at 19).  She claims that "[n]o treating doctor ever suspected a mental illness in [Holden]."  (*Id.*).

Holden's argument is not supported by the facts disclosed in the record.  She disclosed an extended history of treatment for depression.  (Admin. Rec. at 336).  Dr. Gohel, one of Holden's pain management physicians, prescribed antidepressants, which Holden took throughout her time with Dr. Gohel.  (*Id.* at 666, 691-93).  Dr. Saqer made extensive observations of Holden's possible mental issues.  For example, his November 29, 2004 office notes state:

> Today, the patient is anxious, shaking and crying.  The patient is having a lot of family problems that is [sic] contributing to her current psychological and medical condition.  The patient is also feeling that there is nothing that will help her get rid of her pain and that she has a lot of hopelessness.  The patient has explained that there are a lot of family issues and psychological issues since childhood that is [sic] augmenting her current pains and giving her a feel of hopelessness.

(*Id*. at 818).  At the next office visit, on December 13, 2004, Dr. Saqer advised Holden "to have a psychological evaluation in order to assess the presence of any psychological barrier that may augment her current pain perception."  He added that they would try physical therapy "[o]nce the psychological condition of the patient is stabilized."  (*Id*. at 819).   The administrative record also indicates that when Dr. Gendron talked to Dr. Saqer as part of Dr. Gendron's assessment, Dr. Saqer indicated that "from a physical standpoint, [Holden] could sustain work activities at a sedentary level," but "from a psychologic standpoint, she has significant psychologic issues and domestic issues that would preclude her from returning to work."  (*Id*. at 1049).

Holden's argument also lacks merit because, as discussed above, IDR and Reliance Standard made a finding, supported by substantial evidence, that Holden was physically able to resume light sedentary work, and therefore was not disabled under the Plan.  Holden's own treating physicians, as well as IDR's and Reliance Standard's experts, supported this conclusion.

On a review of the administrative record for abuse of discretion, this court concludes that Fort Dearborn is entitled to summary judgment.

### C.    *De Novo* Review

#### 1.    *The Scope of* De Novo *Review*

Fifth Circuit case law provides little recent guidance at to how to conduct a *de novo* review of factual determinations in an ERISA case.  Since *Pierre*, it appears that only one district court in the Fifth Circuit has reviewed an ERISA plan fiduciary's factual benefit

48

determinations *de novo*.  In *Southern Farm Bureau Life Insurance Co. v. Moore*, 793 F. Supp. 702, 704 (S.D. Miss. 1992), the district court conducted a bench trial and admitted evidence not included in the administrative record on the cause of death in a case challenging the denial of life insurance benefits.  But the Fifth Circuit reversed, concluding that the district court had erred in conducting a *de novo* review because the benefits denial was based on factual determinations made by the plan administrator and those determinations should have been reviewed under an abuse-of-discretion standard.  993 F.2d 98, 101 (5th Cir. 1993).

The Fifth Circuit rule before *Pierre* was that *de novo* review of a plan administrator's determinations must be limited to the administrative record.  "In reviewing an administrator's decision, a court must focus on the evidence before the administrator at the time his final decision was rendered.  Thus, the reviewing court may not hold a *de novo* hearing on the question of a claimant's entitlement to benefits under an employee benefit plan."  *Offutt v. Prudential Ins. Co. of Am.*, 735 F.2d 948, 950 (5th Cir. 1984) (internal citation omitted).  If additional evidence is presented to the reviewing court on the merits of the claim, "the court should, as a general rule, remand the matter to the plan administrator for further assessment."  *Id*.  In *Offutt*, the district court denied the plaintiff's challenge to the denial of benefits after conducting a *de novo* review of the administrative record.  On appeal, the plaintiff argued that she had been harmed by new findings made by the court in the *de novo* review.  The Fifth Circuit concluded that the district court should have conducted an abuse of discretion review, but concluded that the plaintiff had not been harmed because an abuse of discretion or *de novo* review of the record would yield the same result and "no new evidence" had been submitted

49

to or considered by the district court.  The Fifth Circuit indicated that had the district court

considered new evidence, it would have committed error.  *Id.* at 951.

Because the Fifth Circuit has not revisited the issue since *Offutt*, this court also

examines more recent cases from other circuits.   Whether a court's *de novo* review of a plan

administrator's determinations should go beyond the administrative record is the subject of

a circuit split.  The Sixth Circuit restricts review to the administrative record, on the basis that

allowing the court to consider evidence outside the administrative record would deluge the

courts and expand their role in a way Congress did not intend:

> Nothing in the legislative history suggests that Congress intended
> that federal district courts would function as substitute plan
> administrators, a role they would inevitably assume if they
> received and considered evidence not presented to administrators
> concerning an employee's entitlement to benefits.   Such a
> procedure would frustrate the goal of prompt resolution of claims
> by the fiduciary under the ERISA scheme.

*Perry v. Simplicity Eng'g, A Div. Of Lukens Gen. Indus., Inc.*, 900 F.2d 963, 966 (6th Cir.

1990).

The Eleventh Circuit, by contrast, permits review beyond the administrative record,

on the basis that before ERISA, parties would have been free to submit evidence outside the

administrative record and that *Bruch* requires courts to continue to make such protection

available to litigants:

> American Home's contention that a court conducting a de novo
> review must examine only such facts as were available to the
> plan administrator at the time of the benefits denial is contrary to
> the concept of a de novo review. During oral argument,
> American Home's counsel conceded that absent ERISA, there

50

> would be no deferential standard of review of the denial of
> coverage. Thus, what the Supreme Court said of a similar
> contention advanced in *Firestone* is equally applicable to this
> contention: "Adopting [this] reading of ERISA would require us
> to impose a standard of review that would afford less protection
> to employees and their beneficiaries than [they enjoyed] before
> ERISA was enacted."

*Moon v. Am. Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir. 1989) (quoting *Bruch*, 489 U.S. at 114).

"Most [other] circuits have adopted rules somewhere in between these extremes, allowing the admission of additional evidence in de novo cases in limited circumstances." *See Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1201-02 (10th Cir. 2002) (citing cases). One point of common emphasis in these circuits is that "it is the unusual case in which the district court should allow supplementation of the record." *Id*. at 1203; *see also DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 65-67 (2d Cir. 1997) ("[T]he decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause."); *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993) ("[C]ourts conducting de novo review of ERISA benefits claims should review only the evidentiary record . . . except [in] . . . [e]xceptional circumstances."); *Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir. 1993) ("[T]he district court should not exercise" its discretion to expand the administrative record "absent good cause to do so.").

In *Quesinberry*, the Fourth Circuit set out a list of factors that district courts may consider in determining whether to allow evidence outside the administrative record:

51

> Exceptional circumstances that may warrant an exercise of the court's discretion to allow additional evidence include the following: claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

987 F.2d at 1027; *see also Hall*, 300 F.3d at 1203 (adopting *Quesinberry* factors).  The *Quesinberry* court added that "the introduction of evidence is not required" in cases falling under one or more of these factors.  "A district court may well conclude that the case can be properly resolved on the administrative record without the need to put the parties to additional delay and expense."  987 F.2d at 1027.

Another point of common emphasis among the circuits is that district courts should carefully consider whether the administrative record is sufficiently developed, whether there is good reason for the absence in the administrative record of specific additional evidence that a party seeks to submit, and whether the record would meaningfully be enhanced by the introduction of additional evidence.  The Fourth Circuit advises that:

> [T]he district court should address why the evidence proffered was not submitted to the plan administrator.  If the administrative procedures do not allow for or permit the introduction of the evidence, then its admission may be warranted.  In contrast, if the evidence is cumulative of what was presented to the plan administrator, or is simply better evidence than the claimant

52

> mustered for the claim review, then its admission is not
> necessary.

*Id*.  The Tenth Circuit has indicated that "[t]he party seeking to supplement the record  bears

the burden of establishing why the district court should exercise its discretion . . . by showing

how that evidence is necessary to the district court's de novo review."  *Hall*, 300 F.3d at 1203.

A district court is on more secure ground in considering evidence outside the administrative

record on *de novo* review if there were significant factual deficiencies in the administrative

record.  In *Luby*, for example, the Third Circuit affirmed the district court's consideration of

outside evidence because "[t]here was simply no evidentiary record for the district court to

review" on the disputed fact issue.  944 F.2d at 1185.  The Seventh Circuit affirmed the

consideration of evidence outside the administrative record in *Casey v. Uddeholm Corp.*, 32

F.3d 1094, 1098-99 (7th Cir. 1994) for much the same reason.

Conversely, a district court is on secure ground in refusing to consider evidence outside

the administrative record if the party seeking to expand the record failed to demonstrate what

new information such expansion would yield, or why the new evidence was not originally

included in the administrative record.  In *Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d

1093, 1095 (8th Cir. 1992), for example, the Eighth Circuit affirmed the district court's refusal

to consider a medical report not in the administrative record.  The court observed:

> This additional evidence, created after litigation had begun, was
> known or should have been known to Davidson during the
> administrative proceedings.  No change in Davidson's condition
> occurred after Prudential denied his claim, and Davidson knew
> what his medical limitations were when he first sought
> continuing LTD benefits.  Indeed, the administrative record is

> replete with medical reports, physician's statements, vocational
> assessments, and other evidence bearing on Davidson's ability to
> do work.   Prudential nevertheless gave Davidson multiple
> opportunities to supplement the record.   Thus, if Davidson
> believed the evidence he now offers was necessary for Prudential
> to make a proper benefits determination, Davidson should have
> obtained this evidence and submitted it to Prudential.

*Id*.  The court concluded that the plaintiff's offer of new medical evidence at the district court

stage "amount[ed] to nothing more than a last-gasp attempt to quarrel with Prudential's

determination that he is capable of gainful employment." *Id*.  A similar fact situation occurred

in *Perry*, 900 F.2d at 967, in which the plaintiff had failed to produce evidence for the

administrator that he was "totally disabled" within the meaning of the disability plan.  The

Sixth Circuit noted that "[a]bsolutely no evidence was submitted to the administrator

indicating that Perry was totally disabled during the time he had coverage, as the plan

requires."  It observed that it was "[n]ot until Perry asked the district court to reconsider its

order granting summary judgment to Simplicity [that] he submitt[ed] any evidence of

disability during the time he had coverage." *Id*. at 967.

Because the other circuits do not differentiate between findings of fact and

interpretations of plan terms in assessing whether *de novo* or abuse of discretion review

should apply, but rather treat the concepts as intertwined, it is unclear whether the factors

considered by these circuits in determining whether outside evidence is appropriate on *de

novo* review would vary depending on whether the disputed issue is a factual determination

or the interpretation of a plan term.  But at least two courts have suggested that the answer is

yes.  In *Masella v. Blue Cross & Blue Shield of Conn., Inc.*, 936 F.2d 98, 104 (2d Cir. 1991),

the Second Circuit posited that extra-record "evidence regarding the proper interpretation of the terms of the plan" should be admissible while "evidence intended to establish a particular historical fact regarding the claimant" should not be. "[C]onsideration of evidence relevant to plan interpretation on de novo review does not implicate the Sixth Circuit's concern that courts would become 'substitute plan administrators . . . .'" *Id.* The *Quesinberry* court listed "the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts" as one of the factors in deciding whether such evidence should be considered. 987 F.2d at 1027.

*Offutt* remains good law in the Fifth Circuit. Taking into consideration the weight of authority from other circuit courts, this court concludes that it need not consider evidence outside Holden's administrative record in conducting a *de novo* review of the decision to terminate her disability benefits. Holden has not argued that evidence outside the administrative record would be necessary or even useful to determine the issues in this case. She does not identify any additional evidence that should be considered. Her argument for reversal on *de novo* review is that the facts in the administrative record have been misconstrued, not that the administrative record is incomplete or inadequate. (Docket Entry No. 27 at 23-25). In short, there is no evidence of "good cause" or "exceptional circumstances" that supports considering evidence outside the administrative record. *DeFelice*, 112 F.3d at 65; *Quesinberry*, 987 F.2d at 1027.

An application of the *Quesinberry* factors supports this conclusion. First, the administrative record is well developed, with letters and reports from medical professionals

that adequately explain the issues. Although Holden challenges the accuracy of the information provided to IDR's medical experts and their conclusions, (Docket Entry No. 27 at 24), their opinions are largely consistent with those expressed by Holden's treating physicians. Second, Holden was provided adequate review procedures for her claims. Her benefits-denial letters contained proper notice of the right to appeal and invited her to provide IDR with any evidence that she believed was relevant to the determination of her case. (Admin. Rec. 897-98, 1079). The evidentiary record as to her disability is well-developed. Third, the dispute in this case is based on the factual determination that Holden was no longer disabled, not about the interpretation of Plan terms. As several courts have recognized, courts should be particularly cautious about going beyond the administrative record when a factual determination is at issue, to avoid becoming effectively "substitute plan administrators." *Perry*, 900 F.2d at 966; *Masella*, 936 F.2d at 104; *Quesinberry*, 987 F.2d at 1027. Fourth, although the relationship between the payor and the administrator in this case is not entirely clear, it appears that Fort Dearborn paid claims while IDR made factual determinations and eligibility decisions. This relationship does not raise concerns about partiality by IDR in its findings of fact. Fifth, although the claims at issue would have been insurance contract claims before ERISA, that fact alone is insufficient to require consideration of evidence outside the record. The Eighth Circuit in *Davidson* and the Sixth Circuit in *Perry* both affirmed the district court's decision to consider only the administrative record despite the fact that the disputes in those cases involved insurance policies. Sixth, as noted, Holden does not identify

or present additional evidence that Holden did not and could not have presented in the administrative process.

The *de novo* review is appropriately limited to the administrative record.

*2.*        De Novo *Review*

On a *de novo* review of the administrative record, this court concludes that Holden was physically capable of resuming light sedentary work.   As the treating and consulting physicians concluded, the record does not show a physical basis for the degree, extent, and duration of pain Holden experienced after early 2004.   Holden had her final back surgery on June 30, 2003 to remove hardware inserted during her October 2001 surgery.   (Admin. Rec. at 682).   At this surgery, Dr. Graham concluded that the lumbar fusion from her October 2001 surgery was "well-established." (*Id*. at 468-473, 557-59).   Dr. Graham expected that Holden should fully recover by January 2004.   (*Id*. at 696-97).   An MRI conducted at Dr. Gohel's request on February 16, 2004 showed a solid fusion and "maintained" alignment, with no evidence of significant spinal stenosis, neural foraminal narrowing, or nerve-root impingement.   (*Id*. at 664-65).   Reviewing this MRI and Holden's other medical records, Dr. Krebs found "no evidence of objective impairment which would prevent the claimant from returning to work at a sedentary level." (*Id*. at 783).   An MRI conducted at the request of Dr. Saqer the following year, on February 11, 2005, showed a "fairly solid appearing fusion from L4 to L5," "minimal bulging above the fusion L3-4 accompanied by faced arthopathy more so on the left with a small degree of left lateral recess narrowing without nerve root deformity seen," and "faced arthoropathy left greater than right at L5-S1." (*Id*. at 912-13).   Dr. Graham

57

reviewed this MRI in August 2005 and concluded that there was no indication for additional surgical treatment. (*Id*. at 1041). Dr. Gendron reviewed this MRI with the rest of Holden's record and concluded that there was a solid fusion that should leave Holden "physically capable of sustaining activities at a sedentary level." (*Id*. at 1057). Dr. Marion also reviewed the MRI and concluded that these "stable radiological findings . . . are inconsistent with her claim of total incapacity." (*Id*. at 1157).

The record indicates that Holden was physically able to return to some type of light, sedentary work. Her treating physicians and IDR's and Reliance Standard's experts agreed that there were significant physical limitations on what Holden could do. Dr. Graham acknowledged that "there are probably many jobs which she would not be able to perform because of her impairment." (*Id*. at 726). Dr. Marion conceded that Holden's "objective impairment supports significant occupational restrictions," and went on to place significant limits on the type of work Holden could perform. (*Id*. at 1157). But the Plan provides that physical disability continues after two years only if the beneficiary is unable to "perform each of the material duties of any gainful occupation for which [she] is reasonably fitted taking into consideration training, education or experience." (*Id*. at 5). Jody Barach, a vocational rehabilitation specialist hired by Reliance Standard, concluded that Holden would be able to function in several sedentary positions, including her former occupation as a Customer Service Representative. (*Id*. at 1177).

Barach's findings are bolstered by the opinions of Holden's doctors and IDR and Reliance Standard's experts that Holden could resume some type of sedentary work. Dr.

Gohel indicated that Holden had the ability to return full time to her former occupation or a different occupation.  (Admin. Rec. at 628-630, 702-08).  Dr. Graham opined that "she might be able to perform some type of light duty job, depending on the situation."  (*Id.* at 726).  Dr. Saqer stated in August 2005 that Holden was physically capable of performing sedentary work.  (*Id.* at 1049-050).  Dr. Krebs "found no evidence of objective impairment which would prevent the claimant from returning to work at the sedentary level" and stated that Holden was "capable of functioning at the sedentary physical demand level and could conceivably return to work at that level at the present time."  (*Id.* at 783).  Dr. Gendron, the expert who reviewed Holden's medical file following her first appeal, found that "[t]here is no data to suggest that the claimant on a physical basis would be unable to sustain activities at a sedentary level with lifting up to twenty pounds." (*Id.* at 1060).  Dr. Marion agreed that Holden was "functionally capable of working at the modified light to sedentary occupational level."  (*Id.* at 1156).

This court has carefully considered the contrary findings from Holden's two FCEs, but concludes that these findings are outweighed by the consensus of Holden's treating physicians and of IDR's and Reliance Standard's experts that Holden was physically capable of returning to light, sedentary work.  This court has also notes the opinions of Drs. Krebs and Gendron that the FCE results are of limited utility because the FCE cannot differentiate between performance issues caused by psychological or emotional rather than physical issues.  (*Id.* at 784).

The record suggests that Holden had emotional and psychological issues, complicated by a documented dependence on pain medication, that might have affected her ability to

return to work.  Holden had been treated for depression with Xanax and Imipramine for seven

years before her back surgery in September 2000.  (*Id.* at 278-88).  Holden stopped seeing Dr.

Graham in November 2003 after his repeated requests that she "taper off" the pain medication

and after he recommend that she enter a structured drug rehabilitation program.  (*Id.* at 686).

Dr. Dixon noted in Holden's first FCE that she demonstrated "significant fear of re-injury and

pain focused behavior."  Dr. Dixon also proposed intervention for Holden's "documented

dependence on pain medication."  (*Id.* at 735).  Dr. Saqer recommended psychiatric care after

noting in November 29, 2004 that Holden "explained that there are a lot of family issues and

psychological issues since childhood that is [sic] augmenting her current pains and giving her

a feel of hopelessness."  (*Id.* at 818).  He also noted to Dr. Gendron that Holden had

"significant psychologic issues and domestic issues that would preclude her from returning

to work."  (*Id.* at 1049).  Drs. Krebs, Gendron, and Marion all agreed that although Holden's

physical condition permitted her to return to work and did not account for the level of pain

and functional limitations she reported, she might have emotional or other issues that could

affect her and her ability to return to work.

Such evidence in the record, coupled with Holden's insistence that she could not sit

or concentrate long enough to work at any job, and her insistence that she could only do

minimal housework, showed the need for further evaluation of the impact of emotional and

psychological impairments.  IDR, Reliance Standard, and Fort Dearborn did not ignore this

evidence and simply conclude that Holden could return to work and was not disabled.  IDR

attempted to determine whether "from a psychological standpoint [Holden] was truly

impacted to a degree that would limit [her] ability to perform [her] own or another occupation at this time." (*Id*. at 895). IDR scheduled a neuropsychological examination in Holden's home. Holden cancelled this examination twice. On the third attempt, the psychologist reported that Holden "refused to allow me . . . to provide any exam findings to IDR and said she would not consent to psychological testing, saying she had seen a psychologist and the psych complaints were not part of her disability." (*Id*.). Holden admitted to refusing this examination, telling IDR that she thought it would not be "to her insurance advantage." (*Id*. at 983-940). IDR also sought and reviewed the records of Dr. Ginsberg, Holden's psychiatrist. Those records indicated that Holden was not experiencing any mood swings or depression, although she was experiencing increased anxiety. (*Id*. at 1077). After Holden's first appeal, IDR approached Dr. Ginsberg for additional information, but he "declined to comment." (*Id*. at 1078).

The information in the record shows no physical explanation for the disabling pain Holden reported. The record shows that IDR made multiple attempts to assess the impact of emotional and psychological factors on her pain and ability to function. Holden refused. IDR gave her ample warning that her failure to cooperate in providing this information would impact her claim. When scheduling the neuropsychological exam, IDR informed Holden that it had concluded that "from a physical standpoint" she was capable of returning to work, but that it needed to determine whether psychological issues might otherwise interfere. (*Id.* at 895). IDR's benefits denial letter informed Holden that her test results:

> indicate there is an underlying psychological factor playing a role in your current level of functioning. Unfortunately in order to determine what level, if any impairment exists formal neuropsychological testing is needed, and due to the lack of cooperation on your behalf, no testing has been completed. Since we are unable to determine what if any liability exists on your claim, no further benefits will be issued, and your claim is now closed.

(*Id.* at 896). IDR's first benefits denial letter similarly informed Holden that "[b]ased on the medical information currently on file, there is no supporting documentation of your inability to perform your sedentary occupation from an emotional or physical standpoint on a full-time basis . . . ." (*Id.* at 1079). Holden had ample notice of the importance of this information to IDR's decision, yet refused to provide information about nonphysical reasons for her asserted inability to work.

IDR and Reliance Standard based their determinations on the record available to them. *See Hilton v. Ashland Oil, Inc.*, 103 F.3d 124, 1996 WL 731358, at *7 (5th Cir. Nov. 11, 1996) (unpublished) (upholding denial of benefits where plaintiff twice refused to produce evidence requested by plan administrator, concluding that "by his refusal . . . timely to submit himself for a vocational evaluation, [plaintiff] became a positive obstacle to his own burden of proof"); *Peifer v. Bellsouth Telecomm., Inc.*, No. 94-288, 1995 WL 63062, at *6 (E.D. La. Feb. 14, 1995) (upholding denial of benefits where "plan administrators repeatedly requested an FCE, which plaintiff categorically refused . . . . [T]he plan's administrators were forced to decide plaintiff's future benefits based on the available evidence"). On a *de novo* review

of the record, this court agrees that there is insufficient evidence of a physical or other problem that would prevent Holden from returning to light, sedentary work.

On *de novo* review, this court grants Fort Dearborn's motion for summary judgment and denies Holden's cross-motion.

## V.        Conclusion

Fort Dearborn's motion for summary judgment is granted and Holden's cross-motion for summary judgment is denied.  Final judgment is entered by separate order.

SIGNED on September 30, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge